James W. **PARKHILL**, an individual, on behalf of himself and all others similarly situated, Plaintiff,

v.

**MINNESOTA MUTUAL LIFE INSURANCE COMPANY,** Defendant.

No. Civ.A.97–515 DSD/JMM.

United States District Court, D. Minnesota.

Aug. 13, 1999.

___

Jack L. Chestnut, Karl L. Cambronne, Jeffrey D. Bores, Becky L. Erickson, Chestnut & Cambronne, Minneapolis, MN, Barry A. Weprin, Melvyn I. Weiss, Regina LaPolla, Brad N. Friedman, Milberg Weiss Bershad

Hynes & Lerach, New York City, Joseph J. DePalma, John J. Stoia, Jr., Theodore J. Pintar, Jobeth Halper, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Andrew W. Hutton, Hutton & Hutton, Wichita, KS, W. Christian Hoyer, John N. Newcomer, Jr., James Hoyer & Newcomer, Tampa, FL, Andrew S. Friedman, Bonnett Fairbourn Friedman & Balint, Phoenix, AZ, Ronald R. Parry, Arnzen Parry & Wentz, Covington, KY, Stephen L. Hubbard, Robert W. Biederman, Hubbard & Biederman, Dallas, TX, for plaintiff.

Wayne S. Moskowitz, Gary J. Haugen, Maslon Edelman Borman & Brand, Minneapolis, MN, Garold M. Felland, The Minnesota Mutual Life Insurance Co., St. Paul, MN, James F. Jorden, Waldemar J. Pflepsen, Jr., Sheila J. Carpenter, Derek M. Meisner, Jorden Burt Boros Cicchetti, Berenson & Johnson, Washington, DC, for defendant.

### ORDER

DOTY, Senior District Judge.

This matter is before the court on the motion of plaintiff James Parkhill for class certification. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court denies plaintiff's motion.

### BACKGROUND[1]

Plaintiff is a Florida resident who seeks compensatory and equitable relief on behalf of himself and a class of similarly situated plaintiffs he seeks to represent for defendant's alleged fraudulent conduct and deceptive sales scheme in the marketing and sale of "vanishing premium" insurance policies.[2] Amended Complaint ¶ 3. In essence, plaintiff

alleges that he and members of the class were "fraudulently induced and deceived into purchasing Policies from Minnesota Mutual based upon uniformly false and misleading Policy illustrations, sales presentations, marketing materials and other information approved, prepared and disseminated by Minnesota Mutual through its nationwide sales force of agents." *Id.* Plaintiff alleges that defendant's oral and written uniform sales presentations promised permanent insurance with "vanishing premiums." *Id.* at ¶ 13. However, due to defendant's alleged failure to disclose the underlying assumptions concerning dividend scales and interest crediting rates upon which policy illustrations were based and misrepresentation of other factors, plaintiff contends defendant's policies did not perform as promised. *Id.* at ¶ 31, 34.

By order dated March 2, 1998, the court dismissed with prejudice plaintiff's common law claims for fraud, fraudulent inducement, negligence, negligent misrepresentation, and violation of the Minnesota False Statements in Advertising Act. *See Parkhill v. Minnesota Mutual Life Ins. Co.*, 995 F.Supp. 983 (D.Minn.1998). In *Parkhill*, the court denied defendant's motion for summary judgment on plaintiff's common law claims for breach of contract, breach of fiduciary duty, breach of the duty to deal with an insured in good faith, unjust enrichment, and for declaratory and injunctive relief and reformation, as well as claims brought by plaintiff pursuant to the Minnesota Deceptive Trade Practices Act, Minn.Stat. §§ 325D.43 to 325D.48, and the Minnesota Prevention of Consumer Fraud Act, Minn.Stat. §§ 325F.68 to 325F.70. Plaintiff was required to recast his complaint.

After completing discovery related to class certification, plaintiff now requests that the

---

1. The court has already reviewed the facts underlying the individual claims of plaintiff Parkhill in its March 2, 1998, order granting in part and denying part defendant's motion for summary judgment. *See Parkhill v. Minnesota Mutual Life Ins. Co.*, 995 F.Supp. 983 (D.Minn.1998). As part of the March 2nd order, plaintiff was required to file an amended complaint. The facts alleged in the Amended Complaint are identical to those in the original Complaint.

2. As the court has already explained, a "vanishing premium" policy is one where, after a certain number of premium payments, the policy itself

generates sufficient income through dividends and interest to pay any additional premiums due. In other words, premiums paid in the initial years of a policy are supposed to generate sufficient value to pay all future premiums due in later years, so that future premiums, in essence, "vanish." The assumption that premiums will "vanish" depends on, among other factors, mortality experience, expenses, dividends, and associated interest rates. A change in any of these variables can affect the date by which premiums will "vanish."

court certify a class action on behalf of the following class:

All persons and entities who purchased individual cash value life insurance products, including Classic Life, EconoLife, Adjustable Life and Survivorship Life, whose crediting basis used the Ultimate Interest Method, from defendant the Minnesota Mutual Life Insurance Company from and after July 1, 1985. The Company's officers, directors, sales agents, employees and affiliates are excluded from the class.

Rather than seeking certification based on "vanishing premiums," as might be expected from an examination of the Amended Complaint, which contains the same allegations as the original Complaint, plaintiff's motion for class certification focuses on the advertisement and administration of Ultimate Interest, the methodology utilized by defendant to credit interest on the cash value of its life insurance policies.[3] Plaintiff contends that defendant improperly applied its Ultimate Interest methodology that controls how interest is credited to applicable insurance policies, and that all of the policyholders included in the proposed class were subject to misconduct by defendant in the way defendant advertised and administered the Ultimate Interest method.[4] Plaintiff now alleges that while vanishing premiums have not disappeared in many cases as promised, that is merely a "symptom" of defendant's manipulation of the Ultimate Interest methodology.

Plaintiff contends, as relevant to this motion for class certification, that defendant's misapplication of Ultimate Interest breached the insurance contract held by class members and violated Minnesota's consumer protection statutes.

Plaintiff contends defendant misrepresented its statements about Ultimate Interest in at least four ways: (1) defendant misled policyholders as to the "current" or "market" interest rate premium payments they were supposed to receive; (2) defendant failed to adjust the Ultimate Interest rate in tune with movements in the market rate; (3) defendant failed to adjust its Ultimate Interest rate in a timely, responsive manner; and (4) defendant failed to assign a "market" or "current" rate to a premium payment when it was made that would, as represented and promised, remain with the premium payment for the next four years. Mem. in Supp. of Pl.'s Mot. for Class Cert. (Docket No. 102) at 3–4. Defendant opposes class certification and contends that much of plaintiff's argument is based on a misunderstanding of how Ultimate Interest works. For the reasons discussed below, the court declines to certify plaintiff's proposed class.

## DISCUSSION

■ Plaintiff seeks certification of a class under Rule 23 of the Federal Rules of

---

3. In its memorandum in opposition to defendant's motion for summary judgment, plaintiff indicated that the substance of his claim was that "Minnesota Mutual represented that Mr. Parkhill would have to make only one out-of-pocket payment on his Policy, and then later, contrary to its representations, it demanded additional out-of-pocket payments." Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss or, in the alternative, for Summ.J. (Docket No. 30) at 5. Indeed, plaintiff indicated that this was "the heart" of his Complaint. Id.

4. The basics of Ultimate Interest are explained in the affidavit of Robert E. Hunstad, defendant's Executive Vice President. Mr. Hunstad explains that defendant may, in its discretion, return a portion of each policyholder's premium payment at the end of the year in the form of a dividend. Affidavit of Robert E. Hunstad (Docket No. 86) at ¶ 5. There are three components to the dividend calculation: mortality savings, expense savings, and excess interest, with the excess interest cred-

it being an additional non-guaranteed credit on each individual policy's cash value in excess of the rate guaranteed in the contract of insurance. Id. at ¶ 7. Ultimate Interest is defendant's interest crediting methodology for its cash value individual life insurance. Id. at ¶ 10; Response of Defendant to Plaintiff's First Set of Interrogatories, Exhibit 21 to Affidavit of Regina LaPolla (Docket No. 102) at 8–9 ("Minnesota Mutual states that all of the fixed premium individual cash value life insurance products sold during the relevant period credited dividends and/or interest using the 'Ultimate Interest Rate' once this crediting method was adopted by Minnesota Mutual in 1984[.]"). With Ultimate Interest, the cash value associated with each new premium payment, whether for an existing or new policy, is assigned an interest rate based on current investments made by the company. Id. at ¶ 12. Defendant's written insurance contracts say nothing about dividend crediting methods, and the Ultimate Interest method is not described in any policy. Id. at ¶ 12.

Civil Procedure. In requesting class certification, plaintiff bears the burden of showing that the class should be certified and that the requirements of Rule 23 are met. *Coleman v. Watt,* 40 F.3d 255, 258 (8th Cir.1994); *Smith v. Merchants & Farmers Bank of West Helena, Ark.,* 574 F.2d 982, 983 (8th Cir.1978); *Jenson v. Eveleth Taconite Co.,* 139 F.R.D. 657, 659 (D.Minn.1991). The court may only certify the class if satisfied, after a rigorous analysis, that plaintiff has met the prerequisites of Rule 23. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The court's determination is based on the facts and circumstances of each individual case, "and must depend upon a careful balance between the convenience of maintaining a class action and the need to guarantee adequate representation to the class members." *Wright v. Stone Container Corp.,* 524 F.2d 1058, 1061 (8th Cir.1975).

■ Under Rule 23(a), plaintiff must establish four threshold requirements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *General Telephone,* 457 U.S. at 161, 102 S.Ct. 2364 (stating that the court may only certify the class if satisfied, after a rigorous analysis, that plaintiff has met the prerequisites of Rule 23(a)). If plaintiff satisfies the prerequisites of Rule 23(a), he must then establish that his action on behalf of the class falls within one of the three categories listed in Fed.R.Civ.P. 23(b). In this case, plaintiff asserts that his class satisfies Rule 23(b)(3):

> that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). In determining predominance and superiority, the court considers several factors, including:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

*See* Fed.R.Civ.P. 23(b)(3); *see also Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615–16, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (stating the nonexhaustive list of factors pertinent to the courts inquiry as to predominance and superiority under Rule 23(b)(3)). The court retains broad discretion in determining whether or not to certify a class under Rule 23. *General Telephone,* 457 U.S. at 161, 102 S.Ct. 2364; *In re Potash Antitrust Litigation,* 159 F.R.D. 682, 688 (D.Minn.1995); *In re Workers' Compensation,* 130 F.R.D. 99, 103 (D.Minn.1990). The court will examine each of the Rule 23 requirements in turn.

## A. Rule 23(a) Requirements

### 1. Numerosity

■ As noted above, the first requirement under Rule 23(a) is that the number of plaintiffs composing the potential class be so numerous that joinder of all members is impracticable. No arbitrary or rigid rules regarding the required size of a class have been established by the courts, and what constitutes impracticability depends upon the facts of each case. *Boyd v. Ozark Air Lines, Inc.,* 568 F.2d 50, 54 (8th Cir.1977). The court may consider the size of the class, nature of the action, size of the individual claims, inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members. *Paxton v. Union Nat. Bank,* 688 F.2d 552, 559–60 (8th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983) (citing C. Wright & A. Miller, Federal Practice and Procedure § 1762).

■ Plaintiff here contends that more than 290,000 current and former policyholders of defendant are putative members of the class and that numerosity is plainly satisfied. Defendant responds that plaintiff's proposed class fails to differentiate among policyholders and includes policyholders who have no complaint about Ultimate Interest, never received and/or relied on any representations relating to Ultimate Interest, and were not misled or damaged by Ultimate Interest. Defendant maintains that the need to engage in a policyholder-by-policyholder analysis to determine who falls within plaintiff's proposed class renders such class overly broad and unworkable.

The court concludes that the large number of potential members in this proposed nationwide class makes joinder of all such individuals impracticable, and that the numerosity requirement is satisfied. While defendant's arguments have validity, they are relevant in the court's Rule 23(b)(3) analysis.

### 2. Commonality

Plaintiff must next show that there are questions of law or fact common to the class. The Supreme Court has commented that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone*, 457 U.S. at 158 n. 13, 102 S.Ct. 2364. Any discussion of the commonality of the class members' claims, therefore, is related to an analysis of whether the class representative's claim is typical of the class he seeks to represent.

■ While plaintiff must demonstrate that there are questions of law or fact common to the class, she need not show that all questions raised by the dispute are common. *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir.1974); *Hedge v. Lyng*, 689 F.Supp. 884, 889–90 (D.Minn.1987). Indeed, individual class members need not be "identically situated" to meet the commonali-

ty requirement. *Paxton*, 688 F.2d at 561. Factual differences are not fatal to maintenance of the class action if common questions of law exist. *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir.1980); *Jenson*, 139 F.R.D. at 664. The requirement is met where the questions linking the class members are " 'substantially related to the resolution of the litigation even though the individuals are not identically situated.' " *White v. National Football League*, 822 F.Supp. 1389, 1403 (D.Minn.1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994), *cert. denied*, 515 U.S. 1137, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1995) (citing *Paxton*, 688 F.2d at 561) (citations and quotations omitted).

■ Plaintiff contends that the primary question here is whether defendant implemented and administered the Ultimate Interest crediting basis as it represented and promised or whether defendant's implementation and administration of Ultimate Interest breached the policies and/or misled policyholders as what they should have received. Plaintiff concludes that because the focus of this litigation is defendant's conduct and because proof of that conduct will not vary significantly among class members, commonality is sufficiently demonstrated. Defendant responds that any common issues are "dwarfed" by individual factual issues.

The commonality requirement under Rule 23(a) is less stringent than the requirement under Rule 23(b)(3) that common issues of law or fact predominate over questions affecting only individual members. Rule 23(a) is satisfied when the legal questions linking the class members are substantially related to the resolution of the litigation. *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir.1995), *cert. denied*, 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 648 (1996) (quotation marks and citations omitted). Here, the court finds that plaintiff has demonstrated a common connection between the legal claims advanced by members of the purported class. While, as discussed below, the possible factual differences involved in each class members' claim fails to satisfy the Rule 23(b)(3) predominance test, the common legal basis behind each claim satisfies the commonality test of Rule 23(a).

### 3. Typicality

■ While the first two prerequisites under Rule 23(a), numerosity and commonality, form the core of the class action concept, the latter two prerequisites, typicality and adequate representation, focus on the desired characteristics of the class representative. *Sondel v. Northwest Airlines, Inc.,* 1993 WL 559031 at *8 (D.Minn. Sept. 30, 1993) (citing 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.13, at 3–71 (3d ed.1993)). In the Eighth Circuit, the typicality requirement is met when other members of the proposed class have "the same or similar grievances as the plaintiff." *Paxton,* 688 F.2d at 562; *Donaldson v. Pillsbury Co.,* 554 F.2d 825, 830 (8th Cir.1977), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); *Wright,* 524 F.2d at 1062. Class members have the same or similar grievances if they have been subjected to the same allegedly unlawful treatment as the named plaintiff. *Id.* The named plaintiffs' charges must be based on treatment " 'not special or unique to [themselves] and . . . show [ ] that a significant number of other members of the class have been similarly [treated]. . . .' " *Hedge,* 689 F.Supp. at 890 (quoting *Donaldson,* 554 F.2d at 825).

■ Plaintiff contends that, like all the policyholders in the purported class, he was entitled under the terms of his policy to have the Ultimate Interest crediting method applied to his premium payments in the same fashion and manner as it was promised and represented by defendant. He further argues that defendant's failure to adhere to its own promises regarding the Ultimate Interest crediting method similarly affected every class member. Defendant responds that plaintiff's claims and the defenses applicable to those claims are unique to plaintiff, rendering him atypical of the class he purports to represent.

The court concludes that plaintiff's claims are typical of those of the rest of the proposed class. While plaintiff held only an Adjustable Life policy and his proposed class includes holders of a variety of other cash value life insurance policies, the variation in the type of policy involved does not diminish the fact that all the policies in question involved the Ultimate Interest method. The similarity of the claims related to Ultimate Interest across the various policies outweighs any differences between the policies involved.

### 4. Adequacy

■ The fourth element of Rule 23(a) requires a finding that the class representative will fairly and adequately protect the interests of the class. This element has two requirements:

> First, the representatives and their attorneys must be able and willing to prosecute the case competently and vigorously. Second, each representative's interest must be sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge.

*In re Wirebound Boxes Antitrust Litigation,* 128 F.R.D. 268, 270 (D.Minn.1989) (citing *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449 (3rd Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)).

Plaintiff makes conclusory arguments that there are no conflicts between himself and other class members and his interests and those of the class are completely congruent.[5] Defendant, however, maintains that because no promises were made to plaintiff regarding Ultimate Interest, he is not even a member of the class he seeks to represent and is subject to unique defenses.

The court finds that plaintiff's claims are similar to a majority of members of the proposed class. He is therefore an adequate class representative. However, as the court will discuss next, defendant's argument that no promises were made to plaintiff regarding Ultimate Interest demonstrates how questions affecting individual members of the class predominate over common questions of law or fact, thereby precluding class certification.

---

5. Plaintiff also argues that his counsel is composed of experienced class action attorneys who could successfully prosecute this action. Defendant does not contest this assertion, and the court will assume that counsel could adequately represent the interests of the class.

**340**

### B. Rule 23(b)(3) Requirements

Although the court finds that plaintiff has satisfied the requirements of Rule 23(a), he has failed to demonstrate that class certification is appropriate under Rule 23(b)(3). *See Amchem,* 521 U.S. at 609, 117 S.Ct. 2231 ("The Third Circuit recognized that Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions."). The first prong of Rule 23(b)(3) requires plaintiff to show that common questions of law or fact predominate over any questions affecting only individual members. The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231; *Brancheau v. Residential Mortg. Group, Inc.,* 177 F.R.D. 655, 660 (D.Minn.1997). A claim will satisfy the predominance requirement "when there exists generalized evidence which proves or disproves an element on a simultaneous, classwide basis, since such proof obviates the need to examine each class member's individual position." *In re Potash,* 159 F.R.D. at 693; *see also In re Workers' Compensation,* 130 F.R.D. at 108 (recognizing that there are no bright lines for determining predominance).

Plaintiff contends that the following questions of law or fact common to members of the class predominate over any questions affecting only individual members: (1) whether defendant applied the Ultimate Interest crediting method as it promised it would; (2) whether defendant applied the Ultimate Interest method as it represented it would; (3) whether defendant misrepresented and mislead the class concerning the Ultimate Interest crediting method; and (4) whether the class was damaged and the extent of its damages. Plaintiff claims the predominance test has been met because defendant has admitted that Ultimate Interest is a term of every cash value insurance contract and the pertinent evidence in this case will come from defendant's corporate headquarters. Plaintiff seeks certification of the proffered breach of contract and Minnesota

statutory claims. The court will consider each in turn.

### 1. Breach of Contract

Plaintiff alleges that defendant's "failure to adhere to the Ultimate Interest Method as promised in the plan of insurance breached the class members' contracts." Mem. in Supp. of Pl.'s Mot. for Class Certification (Docket No. 102) at 7. Plaintiff's actual Adjustable Life III Policy, however, says nothing about Ultimate Interest. *See* Adjustable Life III Policy of James Warren Parkhill, attached to Affidavit of Derek M. Meisner (Docket No. 79) at app. 0123–46. Indeed, the policy's only statements regarding interest are as follows:

> Each year we determine if your policy will share in our divisible surplus. We call your share a dividend and credit it to you on your policy anniversary under one of the dividend options shown below. We do not expect your policy to share in any divisible surplus until the end of the second policy year.

> You can request that we apply your dividends in one of the following ways: ...

> **Accumulation**—Left with us to accumulate an interest. Your accumulations will earn interest at a rate to be determined annually by us, but never less than 4%.

Adjustable Life III Policy at app. 0132.

> The methods and factors used to calculate your cash values, reserves and net single premiums are based upon certain mortality tables and interest rates which your state requires us to use. We use the Commissioners 1980 Standard Mortality Table with 4 percent interest.

Adjustable Life III Policy at app. 0134.

What is notable about the written terms of plaintiff's Adjustable Life III Policy is that the policy itself says nothing about the Ultimate Interest methodology utilized by defendant to determine the final interest credited to a particular policy. Indeed, defendant's. Ultimate Interest methodology is described only in the language of six sales brochures provided to defendant's sales force:

> With the Ultimate Interest method, each policyowner receives the current market

rate. This rate may be different for each policyowner, because the rate credited depends on the market rate in effect when the policyowner's premium is received.

Companies using Ultimate Interest are able to invest more of their money at high market rates. The result? The company's investments receive MORE and your life insurance investment receives MORE.

Not only does Ultimate Interest earn you a better long-term return, it responds to market rates quickly. You'll never have to worry about your premiums earning a lower than market return when interest rates are heading up. And, because it allows you to invest at current market rates throughout the life of your policy, Ultimate Interest gives you more control over your insurance investment. You decide when to take advantage of higher market rates.

How Well Will Your Insurance Investment Hold Up Over the Next 10 Years?, Exhibit 1 to Affidavit of Regina LaPolla (Docket No. 102);

> With Ultimate Interest, we credit current, competitive interest rates to each premium payment.

> With Ultimate Interest, we credit *current* interest rates to *current* premium payments. Not just for a year, but for the entire lifetime of your policy. Each and every time you pay a premium, we credit it with an interest rate that reflects market conditions on the day we receive it.

Most People Think Life Insurance is Boring. At Last, We've Found a Way to Keep Your Interest Up, Exhibit 2 to Affidavit of Regina LaPolla (Docket No. 102);

> We admit we're biased toward the Market Rate Method. After years of using the Portfolio approach, we've invested a lot of time and effort in the sophisticated systems necessary to administer Ultimate Interest, our version of the Market Rate Method. But we believe it gives policyowners the most competitive, equitable and responsive way to credit interest—and will provide the best long-term return on their cash values.

How to Look Out for Your Best Interest, Exhibit 3 to Affidavit of Regina LaPolla (Docket No. 102);

> Now, with the introduction of Ultimate Interest, you're assured of receiving the most current, up-to-date return on those dollars. With Ultimate Interest, we credit *current* interest rates to *current* premium payments. No matter how long you've owned your policy. Each and every time you pay a premium, we credit it with an interest rate that reflects current market conditions on the day we receive it.

Your Life Insurance May be a Year Older, But It Hasn't Aged a Day, Exhibit 4 to Affidavit of Regina LaPolla (Docket No. 102);

> With Ultimate Interest, we credit *current* interest rates to *current* premium payments. Not just for a year, but for the entire lifetime of your policy. Each and every time you pay a premium, we credit it with the interest rate that's current on the day we receive it.

Does Your Insurance Company Treat You Like Yesterday's News?, Exhibit 5 to Affidavit of Regina LaPolla (Docket No. 102); and

> Minnesota Mutual credits interest using Ultimate Interest, commonly referred to as the investment cell method. Ultimate Interest credits all premium payments or cash value increases—on old and new policies alike—with an interest rate that is tied to the interest rates currently found in the marketplace. Once a premium—or cash value increase—is identified with an interest rate it won't be stuck at that rate forever. It will be updated to remain current with market conditions.

Rely on Performance Not Projections, Exhibit 6 to Affidavit of Regina LaPolla (Docket No. 102).

Because Ultimate Interest was not described in the written policy itself, to be a part of the contract of insurance information about this interest-crediting methodology must have been conveyed to class members in some other way. However, as demonstrated by the affidavits of numerous agents who sold defendant's policies, defendant did not provide its agents a script to be used in selling its products and the brochures provided by defendant describing Ultimate Interest were not uniformly used. *See* Affidavit of Anthony J. Andreason (Docket No. 89) at ¶ 4

("I cannot recall ever having been provided with any uniform script by Minnesota Mutual relating to the sale of any of its insurance products."); Affidavit of Gaylen J. Harms (Docket No. 91) at ¶¶ 4–5 ("I have never been provided with any standard script by Minnesota Mutual to be used in conjunction with the sale or presentation of any of its insurance policies. I tailor my presentations to the financial needs of my particular clients. I may or may not use Minnesota Mutual software or marketing materials to determine those needs."); Affidavit of Thomas A. Haunty (Docket No. 104) at ¶ 4 ("I have never been provided with any standard script by Minnesota Mutual to be used in conjunction with the sale or presentation of any of its products. A script is contrary to the needs-based selling approach I utilize and the financial planning function I perform."); Declaration of R. Marshall Jones (Docket No. 98) at ¶ 5 ("I may show clients the chart printed from Main Sail that shows historical Ultimate Interest rates."); Affidavit of Robert Levitz (Docket No. 84) at ¶¶ 10–11 ("To my knowledge, there is no such thing at Minnesota Mutual as a uniform sales presentation. My agency was never urged to sell a particular way or told how to sell 'except that the company encouraged agents to base their sales on the individual needs of a prospect and use appropriate products as solutions to problems.' My agency was not brochure oriented and it was not routine to use an Ultimate Interest brochure. If someone wanted to know what a particular client was told about Ultimate Interest, if anything, they would have to interview each agent and each client."); Declaration of Richard R. McCloskey (Docket No. 95) at ¶ 9 ("To my knowledge, there is no such thing at Minnesota Mutual as a uniform sales presentation. My agency was never urged to sell a particular way or told how to sell except that the company encourages a needs-based sales approach in which the individual needs of a product should be discovered and discussed and then the agents recommend appropriate products as solutions to those needs."); Declaration of Debbie Paul (Docket No. 99) at ¶ 5 ("I rarely use Home Office brochures."); Declaration of Kenneth W. Peterson (Docket No. 96) at ¶ 5 ("I rarely use Home Office brochures. I use a needs-based selling approach and I do not replace clients' policies with other companies."); Affidavit of Dyanne Ross–Hanson (Docket No. 90) at ¶ 8 ("Minnesota Mutual never required me to, or prevented me from, making presentations relating to 'Ultimate Interest,' or other interest crediting methods developed by Minnesota Mutual. It was up to my discretion in each individual transaction."); Declaration of Eugene T. Ricchetti (Docket No. 94) at ¶ 4 ("I have not generally used Minnesota Mutual brochures in my selling process. I explain the concept of Ultimate Interest to clients if they are interested. I use an Ultimate Interest brochure if necessary or appropriate."); Declaration of Paul Thomas (Docket No. 92) at ¶ 4 ("I used the current Ultimate Interest brochure in the sale process if the client was interested in the topic."); Declaration of William J. Thompson (Docket No. 100) at ¶ 4 ("I do not believe I have ever used an Ultimate Interest brochure."); Declaration of Michael R. White (Docket No. 101) at ¶ 5 ("Some of our agents have used Ultimate Interest brochures but their use is not routine.").

These affidavits reveal that defendant's policies were sold in hundreds of thousands of individual meetings between independent agents and prospective clients. Because defendant did not require a uniform sales presentation, the information disclosed by agents to potential policyholders would depend on the client's needs and circumstances. As defendant points out, "[w]hether Minnesota mutual 'promised,' 'misrepresented,' 'misled,' or 'damaged' a putative class member concerning 'Ultimate Interest' requires individual inquiry into each class member's transactions with Minnesota Mutual, all involving non-uniform oral representations at different times and places with different agents." Def. Minnesota Mutual's Mem. in Opp'n to Pl.'s Mot. for Class Certification (Docket No. 78) at 11. Indeed, the breach of contract claim of plaintiff and all other class members rests on a parol contract and extra-contractual promises emanating from representations allegedly made by

defendant's agents.[6] As a result, if certification were granted the court would have to conduct thousands of individual inquiries into the content of each sales presentation, the expectations and questions asked by each policyholder, and the reliance placed by the policyholder on the representations made by defendant's agents. The court would also have to determine whether the representations made to each individual policyholder were misleading. This is not the type of generalized evidence which proves or disproves an element on a simultaneous, class-wide basis as contemplated by Rule 23(b)(3).

Other courts that have considered class certification in nationwide actions brought against insurance companies on similar, if not identical, claims have reached the same conclusion. Most recently, Judge Kyle of this court denied class certification in a case involving almost identical allegations as those presented here. *See Force v. ITT Hartford Life and Annuity Ins. Co.*, Civil No. 97–MD–1204 (D.Minn. June 10, 1999) (attached to the Affidavit of Derek M. Meisner (Docket No. 81)). Judge Kyle noted that "[t]o recover for their claims of fraudulent inducement or breach of contract, ... each Plaintiff will have to individually show that the ITT Hartford sales agent with whom he or she dealt made some oral representation regarding the life insurance policy on which that Plaintiff relied when purchasing the policy." *Force* at 32. Judge Kyle then concluded that:

> The oral representations of each individual sales agent—as well as each Plaintiff's reliance thereon—will necessarily vary from Plaintiff to Plaintiff, from sales agent to sales agent, and from incident to incident.

Because of the need to show reliance on an individualized basis, class-wide adjudication of the Plaintiffs' non-statutory claims would be at best unwieldy, and potentially impossible.

*Id.* at 32–33. Because resolution of plaintiffs' non-statutory claims required individual determinations of whether and to what extent each plaintiff relied on the alleged oral representations of ITT Hartford's sales agents, Judge Kyle held that plaintiffs had failed to satisfy the predominance requirement of Rule 23(b)(3).

Similarly, in *In re Jackson Nat. Life Ins. Co. Premium Litigation*, 183 F.R.D. 217 (W.D.Mich.1998), the plaintiff class sought certification of their fraud, negligent supervision, breach of contract, unjust enrichment, and statutory claims. Plaintiffs there alleged that they had paid large lump sum or fixed premiums for a number of years in reliance on representations that future premiums would "vanish." *Jackson*, 183 F.R.D. at 219. In denying class certification, the court noted that:

> Communications were made primarily by independent insurance brokers; brokers who were not subject to and did not follow uniform policies regarding distribution of policy illustrations. Some shared available illustrations with consumers, some did not . . . . .

> Neither were brokers required to follow uniform sales scripts. Jackson National has adequately demonstrated that this freedom led to great variance in representations made by brokers; some explaining away and others even exacerbating any

---

**6.** The court in *In re Jackson Nat. Life Ins. Co. Premium Litigation*, 183 F.R.D. 217 (W.D.Mich. 1998), noted the importance of individual reliance by each member of the proposed class on oral representations:

> A showing of plaintiffs' reliance upon oral representations is also integral to recovery on their breach of contract claim. This is so because plaintiffs are not seeking merely to enforce the clear and unambiguous terms of their written life insurance policies. Their breach of contract claim depends on the theory that the insurance contracts consist not only of the terms contained in the policies, but also on oral representations. Inasmuch as the insurance policies purport to be integrated con-

tracts, plaintiffs, to avoid the parol evidence rule, must demonstrate that extrinsic evidence of the brokers' representations is admissible as evidence of fraud in the inducement. Again, because materiality and reliance are integral to this showing of fraud, a showing of plaintiffs' reliance is essential also to their breach of contract claim.

*Jackson*, 183 F.R.D. at 222. Plaintiffs here, as in *Jackson*, are seeking to enforce terms contained in sales brochures which may or may not have been delivered to plaintiffs or which were conveyed in conversations with agents which may or may not have taken place. Individual reliance therefore must be shown.

misleading tendencies the policy illustrations may have had....

Thus, determination of whether and which illustrations were given to class members, and of the nature of oral representations made to them at the point of sale, elements of obvious and undeniable importance to all of plaintiffs' claims, are matters requiring individualized fact development. This militates against a finding that common questions of fact posed even by plaintiffs' narrowed core theory predominate.

*Jackson,* 183 F.R.D. at 221. Like *Force* and *Jackson,* reliance in this case may not be proven on a class-wide basis, and because plaintiffs have failed to show that class-wide issues of fact or law predominate over questions affecting only individual members, class certification must be denied. *See also Rothwell v. Chubb Life Ins. Co. of America,* Civil No. 96–83–B (D.N.H. March 31, 1998) (attached ·to Affidavit of Derek M. Meisner (Docket No. 81)) ("[E]ven if plaintiffs were able to prove at trial that [defendant] trained its agents to use the policy illustrations in a misleading manner, it still would not eliminate the need for a 'mini-trial' on each class member's claim to determine the nature of the representations that were made in that case.").

### 2. Minnesota Statutory Claims

 Plaintiff also contends that defendant's alleged deceptive marketing of its policies and manipulation of the Ultimate Interest method violates Minnesota's consumer protection statutes. While the question of reliance, as already discussed, is certainly a factor with regard to plaintiff's common law breach of contract claim, the court also finds that plaintiff's statutory claims for damages under the Minnesota Deceptive Trade Practices Act and Consumer Fraud Act also require a showing of reliance by each plaintiff on representations made by defendant. The Deceptive Trade Practices Act prohibits the representation "that goods or services have ... characteristics ... that they do not have[.]" Minn.Stat. § 325D.44 Subd. 1(5).[7] The Consumer Fraud Act prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact ben misled, deceived, or damaged thereby[.]" Minn.Stat. § 325F.69 Subd. 1.

The parties disagree on the issue of whether reliance is an element of these statutes.[8] Plaintiff points to the pronouncement of the Minnesota Supreme Court that "[i]n·passing consumer fraud statutes, the legislature clearly intended to make it easier to sue for consumer fraud than it had been to sue for fraud at common law. The legislature's in-.tent is evidenced by the elimination of elements of common law fraud, such as proof of damages or reliance on misrepresentations." *State by Humphrey v. Alpine Air Products, Inc.,* 500 N.W.2d 788, 790 (Minn.1993). Other courts, however, have found reliance to be a necessary element of a plaintiff's claim. *See First State Bank of Floodwood v. Jubie,* 847 F.Supp. 695, 704 n. 16 (D.Minn.1993) (opining that elements of common law fraud are equally applicable to a plaintiff's statutory fraud actions); *Garay v. Beers,* 1998 WL 373082 at *1, 1998 Minn.App. LEXIS 765 at * 3 (Minn.Ct.App. July 7, 1998) (unpublished opinion) (noting that in applying the Consumer Fraud Act, elements of common law misrepresentation, including reliance upon a misrepresentation, are considered).

At oral argument, defendant proffered an interesting distinction among the few relevant cases that explains the different holdings on the issue of whether reliance is a necessary element of a plaintiff's statutory claims. Defendant argues that in cases where a plaintiff seeks to recover damages

---

7. Plaintiff alleges that defendant engaged in deceptive trade practices through a variety of means prohibited by Minn.Stat. § 325D.44 Subd. 1. *See* Amended Complaint ¶ 95(a)(i)–(v). The above-cited provision, however, is the most clearly applicable.

8. Because the court in *Force* concluded that plaintiffs' common law claims required each class member to individually prove reliance on the alleged misrepresentation in question, the court did not reach the issue of whether individual reliance must also be shown with regard to plaintiffs' statutory claims.

under Minnesota's consumer protection statutes, reliance is necessary; however, where a plaintiff seeks only injunctive or other equitable relief, no reliance need be demonstrated. Many of the cases fall into this pattern. *Compare Alpine Air,* 500 N.W.2d at 790 (no reliance necessary where court ordered injunctive relief, including restitution, civil penalties, and attorney's fees) *with Jubie,* 847 F.Supp. at 704 (reliance required where plaintiff seeking damages) and *Garay,* 1998 WL 373082 at *2, 1998 Minn.App. LEXIS 765 at *6–7 ("Because respondents here are claiming pecuniary damages, they must establish both that they reasonably relied on appellants' alleged misrepresentation and that this reliance proximately caused their damages.") *and Peterson v. Honeywell, Inc.,* 1994 Minn.App. LEXIS 150 at *13 (Minn.Ct. App. Feb. 8, 1994) ("To establish a claim of damages for misrepresentation under the trade and consumer protection statutes, the plaintiff must establish the elements of common law misrepresentation, including justifiable reliance and proximate cause for pecuniary loss.").

Indeed, the court in *In re Miracle Ear Consumer Litigation,* Case No. 94–1696 (Hennepin County District Court, Oct. 13, 1994) (Exhibit 10 to Affidavit of Cheryl Guibone (Docket No. 103)) expressly stated that "there is an important distinction between a claim for restitution and civil penalties and a claim for incidental and consequential damages." *In re Miracle Ear* at p. 40. The court concluded that "to the extent that plaintiffs seek damages pursuant to their common law and statutory claims, individual issues of reliance and causation would predominate over common questions of law and fact, making the certification of a class action as those claims inappropriate[.]" *Id.* At the same time, the court concluded that an action for restitution and civil penalties "may be maintained ... without requiring a showing that individual consumers were exposed to specific false representations, relied on those representations, and were injured as a result of that reliance." *Id.* at p. 41.

Plaintiffs in this case clearly seek to recover damages from defendant. The Amended Complaint's prayer for relief specifically demands for plaintiff and members of the class "their damages for the wrongful acts complained of[.]" Amended Complaint (Docket No. 43) at p. 45. The court therefore concludes that plaintiffs must demonstrate individual reliance upon representations made by defendant to prevail on either of their statutory claims. Further, even if proof of plaintiff's reliance on oral statements or written materials is not at issue, a jury would still have to examine each plaintiff's case individually to determine whether oral or written disclosures were made and whether such statements were actually at odds with other disclosures or defendant's actions. Class certification under Rule 23(b)(3) must therefore be denied for the same reasons discussed in conjunction with plaintiffs' breach of contract claim.

## CONCLUSION

Based on a review of the file, record, and proceedings herein, and for the reasons discussed, the court concludes that plaintiff has failed to satisfy the requirements of Fed. R.Civ.P. 23(b)(3). Therefore, **IT IS HEREBY ORDERED** that:

1. The motion of defendant Minnesota Mutual Life Insurance Company to strike the affidavit of Russell J. Weintraub (Docket No. 105) is granted;[9] and

2. The motion of plaintiff James W. Parkhill for class certification (Docket No. 77) is denied.

---

9. The court granted defendants' motion to strike Professor Weintraub's affidavit at the hearing on plaintiff's motion for class certification held on July 30, 1999.